UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 14-20117-Civ-COOKE/TORRES

MICHAEL ASIA,

    Plaintiff,

vs.

CITY OF MIAMI GARDENS, OFFICER
RANDY CARPENTER, and OFFICER
MICHAEL HORN, individually,

    Defendants.

_____/

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

    Plaintiff Michael Asia ("Plaintiff" or "Mr. Asia") brings this action against Defendants City of Miami Gardens (the "City"), Officer Randy Carpenter ("Officer Carpenter") and Officer Michael Horn ("Officer Horn") alleging claims of negligence, excessive force, racial profiling, battery, and false arrest. Defendant City of Miami Gardens filed a Motion for Summary Judgment on Counts I, II, and III of Plaintiff's Amended Complaint (ECF No. 116) and Statement of Undisputed Material Facts in Support of Summary Judgment (ECF No. 117). In response, Plaintiff filed his Response and Incorporated Memorandum of law to Defendant, City of Miami Gardens' Motion for Summary Judgment on Counts I, II, and III of Plaintiff's Amended Complaint (ECF No. 125), as well as his Statement of Undisputed Material Facts (ECF No. 126) and Statement of Disputed Material Facts (ECF No. 127), to which Defendant filed its Reply Memorandum in Support of Motion for Summary Judgment on Counts I, II, and III (ECF No. 129). I have reviewed the parties' arguments, the record, and the relevant legal authorities. For the reasons provided in this Order, Defendant City of Miami Gardens' Motion for Summary Judgment as to Counts I, II and III is granted in part and denied in part.

### I. BACKGROUND

    Plaintiff Michael Asia alleges in Counts II and III that Defendant City of Miami Gardens violated 42 U.S.C. § 1983, allowing its police officers to use excessive force and racial profiling during his December 4, 2010 arrest. He additionally alleges, in Count I, that the City

of Miami Gardens was negligent in retaining/supervising Officers Carpenter and Horn.

Plaintiff testified that he was returning home on his bicycle after visiting friends on the afternoon of December 4, 2010 when he was approached from behind by an unmarked green Toyota Camry traveling very slowly. Asia Dep. 47:7-20, ECF No. 128-1. The vehicle had tinted windows so Plaintiff could not see who was inside. *Id.* at 52:19-24. The green Toyota Camry pulled up along Plaintiff's left side, and, fearing for his life, Plaintiff jumped off his bicycle and started running. *Id.* at 53:1-8. At the same time, Officers Carpenter, Horn, and Barney jumped out of the green Toyota Camry. *Id*. The officers did not identify themselves as police officers and were not wearing police uniforms. *Id.* at 61:10-23; 75:18-76:7. Plaintiff fled the area on foot and hid in a backyard. *Id.* at 76:13-24. He decided to come out when he heard police sirens and saw uniformed police officers. *Id.* at 76:24-77:1. Officer John Vanderheyden arrived at the scene and instructed Plaintiff to get on the ground and place his hands behind his back. *Id.* at 77:7-8. Plaintiff complied with Officer Vanderheyden's orders. *Id*. Officer Vanderheyden then kneeled down, placed his knee in Plaintiff's back to immobilize him, and placed two sets of handcuffs on Plaintiff. Vanderheyden Dep. 9:1-12, ECF No. 128-2. Officer Vanderheyden, along with another officer at the scene, Officer Pierre, then ordered Plaintiff to roll over so that they could stand him up. *Id.* at 9:13-15. Officer Vanderheyden testified that at that time, Plaintiff was compliant and not combative. *Id.* at 9:15-16.

As soon as Officer Vanderheyden stood Plaintiff up, Officer Carpenter arrived, grabbed Plaintiff's arm, and snatched him from Officer Vanderheyden's grip. *Id.* at 10:1-6. According to Officer Vanderheyden, Officer Carpenter grabbed Plaintiff's arms and jerked him around, saying "stop resisting, stop resisting." *Id.* at 10:16-11:2. Officer Vanderheyden then saw Officer Carpenter step in front of Plaintiff's foot to trip him and force him to the ground. *Id.* at 11:5-11. Plaintiff fell to the ground, face first, and Officer Vanderheyden saw Officer Carpenter standing above Plaintiff, straddling him and punching him in the back and kidney area multiple times. *Id.* at 11:12-21. At this point, Officer Vanderheyden stated that Plaintiff was just laying there, not doing a thing. *Id.* at 11:22-24. At the same time, Officer Vanderheyden also saw Officer Horn run up to Plaintiff and punch him on the top of his head four or five times with both hands. *Id.* at 12:8-21.

Officer Vanderheyden intervened, pushed Officers Carpenter and Horn away, grabbed Plaintiff, and started walking him out of the backyard to his police vehicle. *Id.* at 13:3-8. He

heard Plaintiff say that he needed to go to the hospital and Officer Horn respond, "shut up you pussy." *Id.* at 13:9-14. However, before Officer Vanderheyden could place Plaintiff in his police vehicle, Sergeant Buddy Hunholz intervened and took custody of Plaintiff. *Id.* at 13:20-25. Officer Vanderheyden, within twenty minutes of the incident, contacted Captain Martinez, his duty captain, met with him, and explained what had just transpired. *Id.* at 14:12-25. Officer Vanderheyden then returned to the police station and typed up a report of the incident involving Plaintiff. *Id.* at 15:5-12. An internal affairs investigation was initiated and Officer Vanderheyden provided his statement to investigators that same day. *Id.* at 16:4-16. The next morning, Officer Vanderheyden found a picture of a rat in his mailbox at work. *Id.* at 16:1-18:12.

Defendant City of Miami Gardens disputes almost all of the facts recited above. According to the officers' official Incident/Investigation Report and Complaint/Arrest Affidavit, Officers Horn, Carpenter, and Barney were working a proactive burglary detail within the City of Miami Gardens on December 4, 2010. *See* ECF Nos. 118-1, 118-2. While in a vehicle, Officer Carpenter saw Plaintiff exit the backyard of 17711 NW 14th Avenue pushing a bicycle and immediately recognized him as someone who lived at 16521 NW 19th Avenue. *Id.* The officers decided to make contact with Plaintiff to ensure that he had not just committed a crime. *Id.* As Plaintiff mounted the bicycle and began riding it, Officer Carpenter pulled beside him and identified himself and the other officers in the vehicle as police officers. *Id.* Plaintiff immediately stopped the bicycle, yelled "oh fuck," turned the bicycle around, and began peddling northbound. *Id.* Plaintiff then got off the bicycle and started running. *Id.* Officer Horn exited the vehicle and chased after Plaintiff. *Id.* Officer Horn attempted to stop Plaintiff by grabbing hold of his jacket, but Plaintiff slipped out of his jacket. *Id.* Officer Horn lost his balance and Plaintiff pushed him to the ground and stomped on his left hand, breaking a bone. *Id.* Plaintiff continued to run and Officer Barney gave chase. Officer Barney attempted to grab Plaintiff by the arm, but Plaintiff turned around and pushed Officer Barney in the chest. *Id.* Plaintiff continued to run, with Officers Horn, Barney, and Carpenter in pursuit. *Id.*

Officers Horn, Barney, and Carpenter lost sight of Plaintiff, but received information that he was hiding in the backyard of 17710 NW 14th Court. *Id.* The officers radioed this information and moved into the area along with Officers Vanderheyden and Clifton. *Id.*

3

Officer Clifton saw Plaintiff and ordered him at gunpoint to get on the ground. *Id.* Plaintiff complied and Officer Vanderheyden handcuffed Plaintiff with two sets of handcuffs. *Id.* Officer Carpenter then took custody of Plaintiff and stood him up to search him. *Id.* However, once Plaintiff was standing, he swung his elbow backward, hit Officer Carpenter in the stomach area, and attempted to flee. *Id.* In response, Officer Carpenter struck Plaintiff in the upper chest area. Case Supplemental Report, ECF No. 118-3. Officers Horn, Barney, and Carpenter then forcefully took Plaintiff back to the ground, where he continued resisting. ECF Nos. 118-1, 118-2. Officer Horn attempted to control Plaintiff's head, Officer Barney his arms, and Officer Carpenter his feet. *Id.* Plaintiff bit Officer Horn on his left ring finger, breaking his skin and causing bleeding. *Id.* Officer Horn yelled and struck Plaintiff in the head with his right first two to three times, at which time Plaintiff released the bite. *Id.* Plaintiff was then compliant and transported to the Miami Gardens Police Department by Sergeant Hunholz. *Id.* Plaintiff did not complain about injuries, nor did he request medical attention. *Id.* Officer Horn received treatment at the North Shore Medical Center by Dr. Litsky for a broken bone in his left hand and for a bite wound on his left ring finger. *Id.*

Defendant City of Miami Gardens now seeks summary judgment as to Counts I, II, and III of Plaintiff's Amended Complaint.

## II. LEGAL STANDARD

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he plain language of [Rule 56(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Rule 56(c) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions,

4

answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### III. ANALYSIS

#### A. Count I: Negligent Supervision/Retention[1]

Defendant City of Miami Gardens argues that Plaintiff cannot make out a prima facie case for negligent supervision/retention because the record is devoid of any evidence establishing the following: (1) that the City of Miami Gardens was aware, or should have been aware, of prior problems with Officers Carpenter and Horn that would have necessitated additional training; (2) that the City of Miami Gardens failed to provide additional training; or (3) that the City of Miami Gardens' failure to train caused Plaintiff's damages. In response, Plaintiff argues that Officers Carpenter and Horn willfully and maliciously used excessive force against him after he was already handcuffed and compliant, and the City of Miami Gardens knew of its officers' violent propensities but failed to take disciplinary action against them.

Before addressing the merits of the City's arguments, I must first address the issue of sovereign immunity. Plaintiff correctly asserts that municipalities, such as the City of Miami Gardens, waive their immunity "under circumstances in which the state or agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of [the] state." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1262 (11th Cir. 2001) (citing Fla. Stat. § 768.28(1)). However, this waiver of sovereign immunity does not apply "if the challenged acts of the state agent were 'discretionary' governmental acts rather than merely 'operational' ones." *Lewis*, 260 F.3d at 1262. An act is "operational" if it is "not necessary to or inherent in policy or planning, [but] merely reflects a secondary decision as to how those policies or plans will be implemented." *Id.* at 1265. An act is "discretionary" if it involves an "exercise of executive or legislative power such that, for the court to intervene by way of tort law would inappropriately entangle it in fundamental questions of policy and planning." *Id.* at

---

[1] The terms "negligent supervision" and "negligent retention" are essentially interchangeable. *See Watts v. City of Hollywood, Florida*, --- F. Supp. 3d ---, 2015 WL 7709671, at *5 n. 4 (S.D. Fla. Nov. 17, 2015).

1264–65.  Claims for negligent supervision and retention are considered claims that implicate operational functions of the government, rather than discretionary functions.  *Johnson v. Cannon*, 947 F. Supp. 1567, 1573-74 (M.D. Fla. 1996).  Therefore, I find that the City of Miami Gardens has waived its sovereign immunity with respect to Plaintiff's claim for negligent supervision/retention.

"Negligent supervision occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment." *Dep't of Envtl. Prot. v. Hardy*, 907 So. 2d 655, 660-61 (Fla. Dist. Ct. App. 2005) (internal citations omitted).  An employer "cannot knowingly keep 'a dangerous servant on the premises which defendant knew or should have known was dangerous and incompetent.'" *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005).  However, in alleging a cause of action for negligent supervision or retention, the burden is on the plaintiff to show that the employer had notice of the "harmful propensities" of its employee.  *Willis v. Dade Cty. Sch. Bd.*, 411 So. 2d 245, 246 n. 1 (Fla. Dist. Ct. App. 1982).

Once a plaintiff alleges "facts sufficient to show that an employer received actual or constructive notice of problems with an employee's fitness," the plaintiff must then show that the employer "failed to investigate or take corrective action." *Hardy*, 907 So. 2d at 660–61.  A party has constructive knowledge of a fact "when that party has actual knowledge of facts and circumstances that would lead a reasonable person to inquire and discover the fact in question, or infer its existence." *Dadeland Dodge Inc. v. Am. Vehicle Ins. Co.*, 698 So. 2d 929, 931 (Fla. Dist. Ct. App. 1997).  Additionally, the employer's failure to investigate or take corrective action "must be the proximate cause of the plaintiff's harm," and there must be "a connection and foreseeability between the employee's employment history and the current tort committed by the employee." *Hardy*, 907 So. 2d at 660–61 (internal citations omitted).

Here, Plaintiff alleges that Officers Carpenter and Horn used excessive force against him when he was already secured by handcuffs and nonresistant.  He further alleges that the City of Miami Gardens was on notice of the officers' incompetency and harmful propensities, but that it failed to take any disciplinary action whatsoever against them.  In support of his claim as to Officer Horn, Plaintiff cites to the following: (1) an unauthorized use of force complaint filed against Officer Horn for throwing Cedric Williams to the ground and causing

injuries to his face and shoulder on July 5, 2008; (2) a police brutality complaint filed against Officer Horn on June 5, 2010; (3) Officer Vanderheyden's own complaint against Officer Horn for his unauthorized use of force against the Plaintiff; and (4) an unauthorized use of force complaint against Officer Horn for kicking and using a taser gun against Roy Humphrey after he was already handcuffed on September 9, 2011. *See* ECF Nos. 128-14, 128-15.

In support of his claim as to Officer Carpenter, Plaintiff cites to the following: (1) a complaint filed by Officer Shonadee McNeil, a black female officer, alleging that on December 11, 2007, Officer Carpenter struck her vehicle and made derogatory and disparaging remarks; (2) a complaint filed by Terrick Crosby on January 17, 2008 alleging that Officer Carpenter improperly searched his vehicle, improperly applied handcuffs too tight, and threatened to strike him if he vomited inside the police vehicle; (3) a complaint filed by Aundra Allen against Officer Carpenter for using racial slurs against him and coercing him to consent to a search of his vehicle by threatening to arrest him on August 7, 2008; and (4) a complaint by Terrance Phillips alleging that Officer Carpenter fired multiple rounds into a dog before arresting him on July 27, 2010. *See* ECF Nos. 128-17, 128-18, 128-19.

However, Plaintiff fails to disclose the following pertinent information in his summary of the complaints lodged against both Officers Horn and Carpenter:

1. Cedric Williams' mother, Janice L. Woodside, lodged a complaint with the Miami Gardens Police Department on behalf of her son on July 10, 2008, five days after the incident occurred. The complaint was referred to the Professional Compliance Unit ("PCU") for review and investigation, case number IA 2008-036. The PCU issued its findings on January 22, 2009. After interviewing various witnesses, including employees of Tootsie's Lounge, the complainant, and the officers involved, including Officer Horn, the PCU found Mr. Williams' allegations to be "not sustained." The PCU found that "some minimal forced was used to secure Mr. Williams, but not to the extent that the amount of force used was unreasonable," because several independent witnesses confirmed that minimal force was needed "based on the actions taken by [Mr. Williams]." The PCU also found that the "jail booking photographs do not reveal any injuries," contrary to the unsubstantiated photographs submitted by Mr. Williams' mother.

2. Mr. Hutchins lodged a complaint against Officer Horn, but when the PCU attempted to

7

investigate his allegations by contacting him for further details, he failed to respond or to render a statement. A Use of Force Report was completed after Mr. Hutchins' arrest for felony possession of narcotics indicating that he sustained minor injuries, specifically scrapes and bruises, after a brief foot pursuit and a fall to the sidewalk.

3. Mr. Roy Humphrey lodged his complaint via letter postmarked February 3, 2012. His complaint was referred to the PCU for investigation, case number IA 2012-001. Mr. Humphrey was interviewed in connection with his complaint on February 17, 2012 and asserted that during his arrest, Officer Horn kicked him in the face and physically pushed him to the ground for no reason. PCU investigators also interviewed witnesses at the scene, including Mr. Humphrey's former girlfriend, as well as the officers at the scene, including Officer Horn. In his sworn statement, Officer Horn denied ever kicking or striking Mr. Humphrey. Medical records from September 9, 2011 indicate trauma to the left side of Mr. Humphrey's face, but when asked about the injuries, Mr. Humphrey told officers he received them while involved in a previous fight. After reviewing all the evidence, the PCU found Mr. Humphrey's allegations to be "not sustained" as to Officer Horn, stating that "[t]he evidence is indicative and consistent with the force used to bring Mr. Humphrey to compliance, was necessary; and within departmental policy and state law."

4. On December 11, 2007, Officer Shonadee McNeil's complaint was provided to the PCU for investigation. After considering a taped statement from Officer McNeil, as well as statements from other officers involved, including Officer Carpenter, and dash camera footage and sound, the PCU found allegations against Officer Carpenter to be "not sustained."

5. Mr. Crosby filed a complaint on January 10, 2008 by sending a letter to Julie Ann Smith, the assistant to the City of Miami Gardens Mayor, Shirley Gibson, regarding improper police procedures used during an incident on December 31, 2007. The complaint was referred to the PCU for investigation on January 14, 2008, case number IA 2008-002. Mr. Crosby provided investigators with a verbal statement in support of his complaint. PCU investigators obtained statements from witnesses at the scene, including Mr. Crosby's uncle, as well as from the officers at the scene, including Officer Carpenter, and dash camera footage. A 2008 PCU File Audit from November 16, 2010

indicates that Mr. Crosby's complaint never received a final disposition.

6. The PCU conducted an investigation of the allegations contained in Mr. Aundra Allen's complaint. Mr. Allen stated that Officer Carpenter, in plainclothes and driving a black or dark blue 2006 Chevrolet Impala LS, used racial slurs and threatened to arrest him if he did not consent to a search of his vehicle. After interviewing Mr. Allen as well as witnesses and the officers at the scene, including Officer Carpenter, the PCU found Mr. Allen's allegations to be "not sustained" in a report dated November 14, 2008.

7. The PCU conducted an investigation of Terrance Phillips' complaint regarding Officer Carpenter's shooting of a pitbull dog, case number SI 2010-028. In a report dated August 25, 2010, the PCU, after interviewing Mr. Phillips as well as the officers involved, classified the incident as a shooting investigation and noted the disposition to be "exonerated." In an August 19, 2010 statement, Alan Mandelbloom, a Major in the Support Services Division, stated: "Detective Carpenter acted in a manner that was consistent with proper police training and policy in order to stop the attack of a vicious dog."

Plaintiff offers the above sampling of complaints as evidence that the City of Miami Gardens knew about its officers' incompetency and harmful propensities, but failed to train or take action against them. Plaintiff also relies upon a separate lawsuit filed against multiple officers by Earl Sampson, a resident of Miami Gardens, as well as an order by Judge Mary Jo Francis granting post-conviction relief to another resident of Miami Gardens. I first note that reliance on court orders discussing similar allegations is not evidence for the purposes of summary judgment. *See Esterson v. Broward Cty. Sheriff's Dep't*, 2010 WL 4614725, at *5 (S.D. Fla. Nov. 4, 2010). I also note that only incidents that occurred before December 4, 2010 can be considered for the purposes of determining whether the City was on notice of its officers' alleged incompetency and harmful propensities. Therefore, Officer Vanderheyden's and Roy Humphrey's complaints are not relevant to this inquiry.

Having determined which evidence may be considered, I find that the incidents cited to, which occurred sporadically between 2007 and 2010, are not sufficient to demonstrate that the City had actual or constructive knowledge of the officers' propensity to use unreasonable force. In order to maintain a claim for negligent supervision/retention as to the City, the officers'

employment histories would need to contain incidents that would reasonably place the City on notice that the officers had a propensity for using excessive force against individuals who were already restrained and compliant. *See Dickinson v. Gonzalez*, 839 So. 2d 709, 714 (Fla. Dist. Ct. App. 2003). The professional compliance unit investigations cited to herein would not have alerted the City one way or the other regarding the officers' alleged propensities. *Id.* Therefore, I find that Plaintiff has failed to raise a material issue of fact regarding the City of Miami Gardens' prior knowledge of the alleged "harmful propensities" of its police officers.

However, even if I were to find that the City of Miami Gardens was on notice of its police officers' "harmful propensities," I do not find that Plaintiff has demonstrated that the City of Miami Gardens failed to investigate or take corrective action. In fact, the record reveals just the opposite; that the City of Miami Gardens investigated complaints lodged against its police officers and rendered decisions only after considering the statements of the complainants, witnesses, and officers involved. Additionally, to the extent Plaintiff is attempting to assert that the Miami Gardens Police Department's review procedure is flawed, Plaintiff has failed to provide any evidence in support of that argument. As such, Defendant City of Miami Gardens' motion for summary judgment as to Count I of the Amended Complaint is granted.[2]

**B. Counts II and III: Excessive Force; City's Custom/Policy of Use of Excessive Force and Racial Profiling**

Plaintiff asserts two counts addressing the use of excessive force. In Count II, he asserts that the City of Miami Gardens is liable for the actions of its police officers under 42 U.S.C. § 1983, specifically Officers Carpenter and Horn, when they violated his constitutional rights by using unnecessary and excessive force against him after he was already handcuffed, in custody,

---

[2] Although I am granting Defendant City of Miami Gardens' motion for summary judgment as to Count I, I made my decision in spite of the City's arguments, not because of them. Thus, I feel I must take a moment to caution the City against making blanket legal assertions that are fundamentally incorrect. I am specifically referring to the City's argument that Plaintiff's negligent supervision/retention claim must be dismissed because Plaintiff alleged that City's police officers acted within the course and scope of their employment, but to succeed, an employee's actions must be committed outside the scope of employment. Defendant City of Miami Gardens fundamentally misunderstands the law on this issue and conflates the "course of employment" element of claims for vicarious liability with the "course of employment" element of claims for negligent supervision/retention. The "course of employment" element of the negligent supervision/retention claim refers to a particular period of time, whereas the "course of employment" element of a claim for vicarious liability refers to a realm or sphere of conduct, not a timeframe. "A negligent supervision claim is not premised on vicarious liability; rather, the action triggering liability for negligent supervision is the employer's own decision to retain a dangerous employee. The liability is direct, not vicarious." *Watts*, --- F. Supp. 3d ---, 2015 WL 7709671at *5.

10

and compliant. In Count III, he appears to assert both that the City of Miami Gardens has a policy, custom, or practice of inadequately reviewing civilian complaints concerning police officers' use of excessive force, which allowed police officers with a history of using excessive force to remain on the job, and that the City of Miami Gardens has an unofficial policy, custom, or practice of racial profiling.

Defendant City of Miami Gardens correctly asserts that there is no *respondeat superior* liability for the actions of Officers Carpenter and Horn. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). Therefore, to hold the City liable for constitutional violations, Plaintiff must prove that the City had a policy, custom, or practice that itself caused the deprivation. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1328 (11th Cir. 2015); *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

There are several different ways of establishing municipal liability under § 1983. A municipality can be liable for an official policy enacted by its legislative body (e.g., an ordinance or resolution passed by a city council). *See Hoefling v. City of Miami*, --- F.3d ---, 2016 WL 285358, at *6 (11th Cir. Jan. 25, 2016) (citations excluded). Municipal liability may also attach if final policymakers have acquiesced in a longstanding practice that constitutes the entity's standard operating procedure. *Id.* Or, a municipality may also be held liable "on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Id.* (citing *Matthews v. Columbia Cty.*, 294 F.3d 1294, 1297 (11th Cir. 2002)). "[S]tate and local positive law" determines whether a particular official has final policymaking authority for § 1983 purposes. *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). "[M]unicipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).

Based on the foregoing, I must determine whether the City of Miami Gardens had an official policy in place, acquiesced in a longstanding practice, or ratified the decision of a subordinate sufficient to trigger liability under § 1983 for excessive force and/or racial

11

profiling.[3]

### 1. *Excessive Force*

Plaintiff asserts claims of excessive force in both Counts II and III of his Amended Complaint, but appears to argue that the City of Miami Gardens is liable under two distinct theories.

In Count II, Plaintiff argues that the City of Miami Gardens is liable for Officers Carpenter and Horn's use of excessive force against Plaintiff, in violation of Plaintiff's rights under the Fourth and Fourteenth Amendments. However, even assuming that the incident occurred as Plaintiff alleges and that the officers' conduct constitutes excessive force, Plaintiff has still failed to create a genuine issue of material fact concerning the City's liability under § 1983. As previously noted, a municipality cannot be held vicariously liable for the acts of its employees; municipalities bear liability only if the unconstitutional action implements an official municipal policy or is pursuant to a governmental custom. *See Monell*, 436 U.S. at 690. Plaintiff has failed to present evidence of any policy promoting the use of excessive force among police officers in Miami Gardens. Therefore, despite Plaintiff's assertions to the contrary, there is no genuine issue of material fact as to whether an official policy was a "moving force" behind his alleged constitutional deprivations. *See Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997) (quoting *Monell*, 436 U.S. at 690-94).

Additionally, Plaintiff has failed to create a genuine issue of material fact concerning whether there was a "persistent and widespread practice" of City police officers using excessive force. With respect to the allegations in Count II, Plaintiff has failed to provide any evidentiary support for his claim. Plaintiff has failed to present any evidence of prior incidents of constitutional injuries similar to his, *see* Asia Dep. 141:18-22; *Owens v. City of Fort Lauderdale*, 174 F. Supp. 2d 1282, 1295 (S.D. Fla. 2001), and his own experience with the City's police officers is insufficient to establish a custom or practice. *See Wakefield v. City of Pembroke Pines*,

---

[3] Defendant City of Miami Gardens challenges its liability as to Counts II and III on the grounds that Plaintiff has failed to demonstrate that the City had a policy, custom, or practice that was the moving force behind the alleged violations of Plaintiff's constitutional rights. As such, I will proceed on the assumption that Plaintiff has sufficiently demonstrated, at this stage, that his constitutional rights were in fact violated. Defendant City of Miami Gardens appears to assert, in a footnote to its Reply Memorandum, that "racial profiling" does not in and of itself violate the Constitution. However, Plaintiff has plead, and Defendant does not challenge, that his constitutional rights under the Fourth and Fourteenth Amendments were violated when police officers pursued him on the basis of his race. The targeting of a criminal suspect solely by reference to the subject's race violates the Constitution. *See United States v. Brignoni-Ponce*, 422 U.S. 873 (1975).

269 F. App'x 936, 940 (11th Cir. 2008). Finally, Plaintiff's reference to prior, unsubstantiated allegations of improper use of force are also insufficient on their own to establish a "persistent and widespread practice" in the police department as a whole. *See id.* Of the prior complaints referenced by Plaintiff, only Mr. Williams, Mr. Hutchins, and Mr. Humphrey's complaints are arguably similar in that they involve Officer Horn allegedly using excessive force when securing otherwise compliant individuals. However, these complaints were found to be wholly unsubstantiated, rendering them of little value for the purposes of establishing previous constitutional violations. *See Owens*, 174 F. Supp. 2d at 1296-97 (citing *Roberts v. City of Geneva*, 114 F. Supp. 2d 1199, 1211 (M.D. Ala. 2000) (holding that two previous incidents, neither of which involved an unlawful violation of constitutional rights, were insufficient to show a "widespread practice" on which municipal liability could be imposed)). Therefore, Defendant City of Miami Gardens' motion for summary judgment as to Count II of Plaintiff's Amended Complaint is granted.

In Count III, Plaintiff attempts to hold the City of Miami Gardens liable for Plaintiff's injuries on what appears to be a theory of deliberate indifference; that the City of Miami Gardens was aware of many complaints alleging abuse of police power and police misconduct, but failed to take any steps to rectify the problem by further training or disciplining its officers. "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397 (1997)). The Eleventh Circuit has consistently held that "without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." *Id.* at 1351.

In support of his contention that the City of Miami Gardens failed to properly supervise and/or discipline its police officers, Plaintiff relies upon the following: (1) emails between "Concerned Citizen" and Mayor Oliver Gilbert on December 9, 2010 that raise concerns about how internal affairs investigations are handled "because of other cover ups"; (2) a related anonymous letter dated December 29, 2010 expressing concerns about how Plaintiff was treated on December 4, 2010 and citing to numerous other instances of "police brutality with the plain clothes officer unit," including an incident where a police officer in the crime

13

suppression unit broke a handcuffed prisoner's jaw, was subsequently suspended and terminated, but then rehired after an internal affairs investigation revealed the complaint to be unfounded; (3) internal affairs investigation reports concerning complaints against Officers Carpenter and Horn; and (4) positive annual performance evaluations for Officers Carpenter and Horn for the years 2010 through 2014.

Even when considering all of the above evidence in the light most favorable to Plaintiff, Plaintiff still fails to create a material issue of fact regarding the City of Miami Gardens' liability under Section 1983 for deliberate indifference to its police officers' practice of allegedly employing excessive force during confrontations with the City's citizens. As an initial matter, in determining whether the City had "notice of a need to train or supervise in a particular area," I can only consider evidence from before the date of the subject incident. As such, I am left to consider only the prior complaints lodged against Officers Carpenter and Horn. I do not find that these complaints, which were promptly investigated, put the City of Miami Gardens on notice of a need to train or supervise its officers. *See Gold*, 151 F.3d at 1351-53 (finding that it is rare that only a couple of previous instances will be sufficient to place a municipality on notice of "widespread abuse" constituting deliberate indifference) (citing *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987) (holding that the city did not have any notice of past police misconduct even when presented with ten citizen complaints about police officer Scheib because the plaintiff "never demonstrated that past complaints of police misconduct had any merit.")). As the Eleventh Circuit has aptly noted, "[i]ndeed, the number of complaints bears no relation to their validity." *Brooks*, 813 F.2d at 1193.

The cases Plaintiff relies upon in advancing his position further highlight the deficiencies of his claim. Plaintiff relies heavily upon the Eleventh Circuit's decision in *Depew v. City of St. Marys, Georgia* for the proposition that a city may be held liable for its failure to prevent known constitutional violations. In *Depew*, the plaintiffs alleged that their civil rights had been violated when police officers dragged one plaintiff from his vehicle, threw him to the ground, and beat him. During trial, the evidence presented revealed several prior incidents of police misconduct, as well as the city's failure to train, supervise, and discipline its police officers. Plaintiffs presented evidence that similar incidents of police misconduct had occurred, that the city was on notice, and that officials commended the officers for their actions instead of disciplining them. "The evidence relating to the lack of proper training, supervision, and

14

discipline consisted of various personnel evaluation reports, employee warning reports, directives promulgated by [the chief of police], and the testimony of various witnesses." *Depew v. City of St. Marys, Georgia*, 787 F.2d 1496, 1498 (11th Cir. 1986). The chief of police admitted that he had disciplinary problems with his officers, and further testimony "indicated that the officers received inadequate training concerning the use of force in any given situation and when the use of deadly force was proper." *Id.* Another officer admitted that excessive force had been used against the plaintiffs "but that it was nothing that he had not seen before." *Id.* Finally, evidence adduced at trial demonstrated that the mayor and city council were aware of prior complaints of excessive force but refused to change police policy. *Id.*

In this case, Plaintiffs have failed to cite to any evidence that the City knew of prior police misconduct or that city officials failed to take steps to rectify any alleged misconduct. At most, Plaintiffs have presented evidence that a handful of complaints against Officers Carpenter and Horn were filed between 2007 and 2010, that each complaint was investigated, and that almost all were found to be "not sustained." Plaintiff alleges that city officials knew about prior violations and subsequent community outrage, as evidenced by videos, news articles, news reports, lawsuits, and judicial orders, but failed to act. However, Plaintiff fails to cite to any record evidence in support of his broad assertions. Plaintiff has failed to provide any testimony from city officials indicating that they were aware of violations, but chose to ignore them during the relevant time period. Plaintiff's reliance on an anonymous letter from a concerned citizen after the incident involving Plaintiff is inapposite; it cannot be argued that a letter mailed after the subject incident occurred put the City on notice so that it could have prevented the alleged violation of Plaintiff's constitutional rights. The record evidence in the case before me falls far short of the record evidence before the jury in *Depew*. There, the plaintiff presented strong evidence that the city's police officers ignored rules and regulations by using unreasonable and excessive force, and that while the city had knowledge of this improper police conduct, it failed to take any remedial action. *Depew*, 787 F.2d at 1499. Thus, Plaintiff's reliance on *Depew* is misplaced; it only further magnifies the lack of evidence in this case on the issue of the City's liability for deliberate indifference.

Plaintiff also relies upon *Vineyard v. County of Murray, Georgia*, 990 F.2d 1207 (11th Cir. 1993) for the proposition that the City's failure to supervise/negligent retention of its police officers was the moving force behind Plaintiff's injuries. However that decision is also

15

inapposite. Vineyard was threatened and beaten repeatedly in the head and chest by sheriff's deputies while handcuffed to a hospital bed. *Id.* at 1209. At trial, Vineyard presented evidence that the sheriff's department had inadequate procedures for recording and following up on complaints against individual officers. *Id.* at 1212. Although "it was not unusual to receive complaints" about deputies, "the dispatcher or whoever answer[ed] the telephone ha[d] discretion about the initial handling of the complaint." *Id.* The two deputies who committed the beating were subsequently assigned to investigate Vineyard's complaints, the sheriff's department did not log or document citizens' complaints in any fashion, much less retain records of such complaints, and the two deputies never completed an arrest report for Vineyard's arrest. *Id.* Therefore, the Court found that there was sufficient evidence from which the jury could find that the county's not having a policy and procedures manual, not requiring its deputies to file an arrest report when beatings occur, not logging in or documenting in any way citizens' complaints, and not investigating complaints together were "the moving force" behind the deputies' "use of gratuitous force." *Id.* at 1213.

In this case, Plaintiff has not provided any evidence indicating that the City failed to investigate citizens' complaints or that such failure is the moving force behind the alleged violation of Plaintiff's constitutional rights. In contrast, the evidence demonstrates that the City documents all citizens' complaints, assigns officers from the Professional Compliance Unit to investigate, and retains those records for review. Therefore, once again, Plaintiff's heavy reliance on this case only further magnifies the inadequacy of Plaintiff's evidence as to the City's liability under Section 1983 for deliberate indifference. As such, Defendant's motion for summary judgment as to Plaintiff's claims that the City of Miami Gardens was deliberately indifferent to its police officers' practice of employing excessive force during confrontations with the City's citizens is granted.

2. *Racial Profiling*

Plaintiff also asserts in Count III that the City had a custom or practice of racial profiling and that City officials were both aware of this custom or practice and encouraged it. In support of his argument, Plaintiff cites to the following: (1) the affidavit of Jose Rosado, a police officer with the City, wherein he states that sometime in 2010, Major Chapman directed City of Miami Gardens police officers to target black males from ages 15-30 because "all crimes in the city were being committed by black males ages 15-30"; (2) the deposition

16

testimony of Ali Amin Saleh, a plaintiff in another action against the City of Miami Gardens, wherein Mr. Saleh also states that Major Chapman directed police officers to stop black males between the ages of 15 and 30; (3) the order of Judge Mary Jo Francis vacating Mr. George Baptiste's multiple convictions on the grounds that the City's police department fabricated the bases for his arrests; (4) a lawsuit filed by other City of Miami Gardens' residents naming the city manager, Danny Crew, former mayor, Shirley Gibson, and current mayor, Oliver Gilbert, as defendants; (5) the deposition testimony of Matthew Boyd, a former Chief of Police of the City of Miami Gardens Police Department, who confirmed that in 2010, Wanda Gilbert, a former crime analyst for the City, informed the police department as well as Danny Crew that the city was targeting black males between the ages of 15 and 30; (6) the deposition testimony of Jeffrey Mason, a police officer for the City, stating that he informed the assistant city manager, Vernita Nelson, that during a roll call around February 2012, Major Anthony Chapman spoke about conducting field interrogations on black males between the ages of 15 and 30 years of age; and (7) emails between "Concerned Citizen" and Mayor Oliver Gilbert on December 9, 2010 apprising Mr. Gilbert of the incident involving Plaintiff, stating that the "attack" against him by police officers was racially motivated, and expressing concerns about the impending internal affairs investigation of the incident.

After considering all relevant evidence submitted in the light most favorable to the Plaintiff, I find that a triable issue exists concerning the existence of a policy of racial profiling based upon crime statistics. Additionally, I find that triable issues exist as to whether the City itself was deliberately indifferent to the constitutional violations being committed by the City's police department. Plaintiff has submitted evidence, in the form of deposition testimony by Matthew Boyd, indicating that Wanda Gilbert notified Mr. Boyd and City Manager Danny Crew that she had concerns about the City's targeting of black males between the ages of 15 and 30. As such, viewing this evidence in the light most favorable to Plaintiff, I conclude that genuine issues of material fact exist concerning the City's ratification of the police department's alleged racial profiling policy. Therefore, the City's motion for summary judgment as to the racial profiling claims in Count III is denied.

### IV. CONCLUSION

For the reasons provided herein, Defendant, City of Miami Gardens', Motion for Summary Judgment on Counts I, II, and III of Plaintiff's Amended Complaint (ECF No. 116)

is **GRANTED in part and DENIED in part** as follows:

1. Defendant's Motion is **GRANTED** as to Count I (Negligence). This claim is dismissed.
2. Defendant's Motion is **GRANTED** as to Count II (Excessive Force). This claim is dismissed.
3. Defendant's Motion is **GRANTED** as to Plaintiff's claim regarding the City's deliberate indifference to its officers' alleged use of excessive force in Count III.
4. Defendant's Motion is **DENIED** as to Plaintiff's claim regarding the City's use of racial profiling in Count III.

**DONE and ORDERED** in Chambers, at Miami, Florida, this 25th day of February 2016.

*[signature: Marcia G. Cooke]*
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Edwin G. Torres, U.S. Magistrate Judge*
*Counsel of Record*